UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHIRLEY JOHNSON,                    :
                                    :
        Plaintiff,                  :
                                    :       Civil Action No.:     15-0796 (RC)
    v.                              :
                                    :       Re Document No.:      8
DAVID S. MAO,                       :
        *Acting Librarian of Congress*,   :
                                    :
        Defendant.                  :

MEMORANDUM OPINION

GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS,
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

I. INTRODUCTION

Plaintiff Shirley Johnson is a female employee and supervisor at the Library of Congress.

After she and her own supervisors disagreed about procedures for managing Ms. Johnson's

supervisees on detail in another Library unit, she brought discrimination allegations against her

employer, first at the administrative level and then in federal court.[1] Ms. Johnson's complaint in

---

[1] Although Ms. Johnson's complaint named the "United States Government" as Defendant, *see* Compl., ECF No. 1, the government correctly notes that, in a Title VII suit against a federal agency, the proper defendant is the head of that agency. *See* 42 U.S.C. § 2000e-16(c) ("[T]he head of the . . . agency . . . shall be the defendant."); Def.'s Mot. Dismiss 1 n.1, ECF No. 8. This failure to name the proper defendant would typically be cause to dismiss the complaint. *See Norris v. Salazar*, 885 F. Supp. 2d 402, 413–14 (D.D.C. 2012). Here, however, the government "does not object to the amendment of the caption to conform to this statutory requirement." Def.'s Mot. Dismiss 1 n.1. Acting Librarian of Congress David S. Mao is therefore substituted as Defendant in this action. *See generally About the Librarian*, Library of Congress, https://www.loc.gov/about/about-the-librarian (last visited March 31, 2016) ("David S. Mao became Acting Librarian of Congress Oct. 1, 2015, upon the retirement of James H. Billington.").

this Court states three "claims for relief": violation of Title VII of the Civil Rights Act of 1964, intentional infliction of emotional distress, and injunctive relief.

In a pre-answer motion, the Library moves to dismiss Ms. Johnson's complaint, or, in the alternative, for summary judgment in its favor on Ms. Johnson's claims. Because, on the record presented, a reasonable jury could return a verdict for Ms. Johnson on her Title VII claims based on sex discrimination or retaliation with respect to the removal of certain supervisory duties, the Court declines to grant the Library's motion for summary judgment on those claims. But because Ms. Johnson has not shown significant, tangible harm arising from her performance appraisal, the Court will dismiss Ms. Johnson's Title VII claims based on sex discrimination or retaliation with respect to her performance appraisal. And because Ms. Johnson's intentional infliction of emotional distress claim alleges harm for which Title VII provides a remedy, Title VII preempts that claim and the Court will dismiss it. Lastly, because a claim for injunctive relief is not a freestanding cause of action, the Court will also dismiss Ms. Johnson's third claim.

## II. BACKGROUND[2]

### A. Ms. Johnson's Supervisory Structure

According to the Complaint, Plaintiff Shirley Johnson is a female employee of the Library of Congress, where she has worked for forty years. Compl. ¶¶ 8, 11, ECF No. 1. At the time of the events at issue in this case, she was the Supervisor for the Library's On-site Constituent Support Unit. *Id.* ¶ 11. Ms. Johnson's role as Supervisor was supposed to include

---

[2] At the motion-to-dismiss stage, the Court presumes that the plaintiff's factual allegations in the Complaint are true. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). When citing to documents outside of the pleadings, the Court views the evidence in the light most favorable to Ms. Johnson. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (explaining that, in the summary judgment context, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor").

significant supervisory and managerial responsibilities: she was tasked with supervising a group of employees and with staffing two reading rooms at the Library. *See* Pl.'s Ex. 10, ECF No. 9-13 (reproducing excerpts of Ms. Johnson's performance plan for the appraisal period from March 1, 2014 through August 29, 2014). Ms. Johnson's immediate supervisor was Supervisor Librarian David Waters. *See* Compl. ¶ 11; Pl.'s Ex. 7, at 1, ECF No. 9-10; Pl.'s Ex. 1, ¶ 10, ECF No. 9-4. Her next-level supervisor was Steven Herman, the Chief of the Library's Collections Access, Loan and Management (CALM) Division. *See* Compl. ¶ 19; Pl.'s Ex. 8, ECF No. 9-11; Pl.'s Ex. 9, at 1, ECF No. 9-12. Still higher on Ms. Johnson's supervisory ladder was Mark Sweeney, the Library's Director for Preservation. *See* Pl.'s Ex. 9, at 1.[3]

### B.  2014 Performance Appraisal

Ms. Johnson submits that, in her role at the Library, she works "extraordinar[il]y hard and consistently demonstrates a pattern of relentless and steady execution of not only her essential duties, but also assignments, projects and tasks that fall beyond the scope of her duties." Compl. ¶ 11. Her 2014 performance appraisal covers the rating period from March 1, 2013 through February 28, 2014, was signed by Mr. Waters and Ms. Johnson on May 16, 2014, and agrees with Ms. Johnson's assessment of her work: she received an overall rating of "Commendable," meaning that her "performance and initiative [were] worthy of special notice." Def.'s Ex. 4, at 1–2, ECF No. 8-4. Ms. Johnson also received a "Commendable" rating for each of her major areas of responsibility. *See id.* at 2–3. In particular, her performance appraisal noted that she possessed "extensive supervisory experience" and "perform[ed] very well as Supervisor

---

[3] Ms. Johnson at times refers to Mr. Sweeney as the "Acting Associate Librarian for Library Service." *See* Compl. ¶ 22; Def.'s Ex. 1, at 5, ECF No. 8-1 (reproducing Ms. Johnson's formal administrative discrimination complaint).

of the On-site Constituent Support Unit while [she] and [her] staff adjust[ed] to changing job

duties and work with various units in CALM." *Id.* at 2.

### C.  Detail Assignments for Ms. Johnson's Supervisees

A number of Ms. Johnson's supervisees were detailed in 2014 to work on developmental

assignments. *See* Pl.'s Ex. 1, ¶ 14, ECF No. 9-4; Pl.'s Ex. 8, ECF No. 9-11; Pl.'s Ex. 9, at 1–2,

ECF No. 9-12. In groups of two at a time, they performed temporary rotations supporting the

Library's collections-related activities, managed by the CALM Collections Officer, Beatriz

Haspo. *See* Pl.'s Ex. 8; Pl.'s Ex. 9, at 1–2. Because Ms. Haspo was not a supervisor at the

Library, she was not responsible for the supervisees' sign-in and sign-out processes. *See* Pl.'s

Ex. 1, ¶ 14; Pl.'s Ex. 8; Pl.'s Ex. 9, at 1–2. Instead, Ms. Johnson's supervisors told Ms. Johnson

that she would continue functioning as supervisor and timekeeper for her supervisees on detail

with Ms. Haspo. Pl.'s Ex. 9, at 1.

### D.  Treatment of Ms. Johnson's Male Supervisee on Detail (Robert Bunch)

Early in 2014, two of Ms. Johnson's male supervisees, Robert Bunch and Rodney

Marshall, were working on detail with Ms. Haspo. *See* Pl.'s Ex. 9, at 1, ECF No. 9-12. After a

concern arose about the accuracy of Mr. Bunch's sign-in times, Ms. Johnson approached

Mr. Waters and Ms. Haspo about the issue. *See id.* at 2; *see also* Compl. ¶ 12. Because Mr.

Bunch was scheduled to report for work earlier than Ms. Johnson, Ms. Johnson asked to have

Mr. Bunch sign in at the CALM Division Office, where the office secretary would be able to

monitor Mr. Bunch's sign-in times. *See* Compl. ¶ 12; Pl.'s Ex. 9, at 2. Mr. Waters granted

Ms. Johnson's request. Compl. ¶ 12; Pl.'s Ex. 9, at 2.

After that, both Mr. Bunch and Mr. Marshall began signing in at the Division Office.

Pl.'s Ex. 9, at 2. But even though they were signing in at the Division Office, Ms. Johnson still

wanted to continue functioning as their supervisor, and she still wanted to review and enter their sign-in and sign-out times. *See id.* ("I wanted to continue to do . . . their WebTA sheets, as I had done for the four previous staff members [on detail, because] my office is next door to the division office."). Mr. Waters, however, "no longer allowed [her] to be their timekeeper but instead had the office secretary . . . check and validate Mr. Marshall's and Mr. Bunch's" sign-in and sign-out times. *Id.*

### E.  Treatment of Ms. Johnson's Female Supervisee on Detail (Helen Drakeford)

After Mr. Bunch and Mr. Marshall's time on detail ended, two of Ms. Johnson's female supervisees went on detail with Ms. Haspo. Pl.'s Ex. 9, at 2, ECF No. 9-12. One was Simone Rankin, who began her detail on April 7, 2014. *Id.* The other was Helen Drakeford, who had already worked a detail with Ms. Haspo, and who began her second detail on June 9, 2014. *Id.* Earlier that year, Ms. Johnson has issued supervisory memoranda instructing Ms. Drakeford about Ms. Drakeford's inappropriate use of leave, failure to remain in her work area, and failure to follow supervisory instructions. Compl. ¶ 14 ("Ms. Drakeford received a Counseling Memo on January 29, 2014 and an Admonishment Memo on April 4, 2014 . . . ."); *accord* Pl.'s Ex. 1, ¶ 14, ECF No. 9-4; Pl.'s Ex. 4, at 2, ECF No. 9-7.[4]

Between Tuesday, June 17, 2014 and Friday, June 20, 2014, however, problems between Ms. Drakeford, Ms. Johnson, and Ms. Johnson's supervisors intensified.

On Tuesday, June 17, 2014, Ms. Johnson was on leave for the day. Pl.'s Ex. 9, at 2. She nonetheless learned, through an email from Mr. Waters, that Ms. Drakeford had called the

---

[4] The Library also states, though without citation to evidence, that Ms. Drakeford had previously received a Notice of Proposed Adverse Action for a ten-day suspension. Mem. P. & A. Supp. Def.'s Mot. Dismiss, or in the Alternative for Summ. J. 14–15, ECF No. 8 [hereinafter Def.'s Mem.].

Library and had stated that, because Ms. Drakeford's mother was in the hospital, Ms. Drakeford would not be at work for one or two days. *Id.* Mr. Waters's email also stated that Ms. Drakeford would contact Ms. Johnson if Ms. Drakeford needed further time off from work. *Id.*

On Wednesday, June 18, 2014, Ms. Drakeford reported to work. Compl. ¶ 13; Pl.'s Ex. 9, at 2. But when Ms. Johnson received a telephone message for Ms. Drakeford, Ms. Johnson could not locate Ms. Drakeford in her work area. Compl. ¶ 13; Pl.'s Ex. 9, at 2. Ms. Johnson then left Ms. Drakeford a handwritten message at her work station, asking Ms. Drakeford to contact Ms. Johnson. Pl.'s Ex. 9, at 2. Ms. Drakeford did not contact Ms. Johnson that day. *Id.*

On Thursday, June 19, 2014, Ms. Drakeford still did not contact Ms. Johnson and did not report to work. Compl. ¶ 13; Pl.'s Ex. 9, at 2. Instead, Ms. Johnson learned from Ms. Haspo that Ms. Drakeford had left Ms. Haspo a text message, which stated that Ms. Drakeford would not be reporting to work that day. Pl.'s Ex. 9, at 2. By this point, Ms. Johnson's other supervisees had begun telling Ms. Johnson that Ms. Drakeford was not properly requesting or using leave time. *Id.* Concerned about Ms. Drakeford leaving work early and failing to sign out, Ms. Johnson met with Mr. Waters to discuss the issue. *Id.* After Ms. Johnson asked Mr. Waters whether Ms. Drakeford had requested or received leave for that day from him, Mr. Waters answered that Ms. Drakeford had not. *Id.* To improve the situation, Ms. Johnson asked Mr. Waters whether Ms. Johnson's supervisees on detail with Ms. Haspo could resume signing in and out with Ms. Johnson, instead of at the Division Office. *Id.* Mr. Waters granted Ms. Johnson's request and stated that Ms. Johnson had discretion over her supervisees. *See* Compl. ¶ 15; Pl.'s Ex. 4, at 2; Pl.'s Ex. 9, at 2.

On Friday, June 20, 2014, Ms. Johnson implemented the agreed-upon plan: She verbally counseled Ms. Drakeford about proper procedures for leave requests, for which Ms. Drakeford

should request leave from Ms. Johnson first, and then go up the supervisory ladder if Ms. Johnson was not available. Compl. ¶ 16; Pl.'s Ex. 9, at 2. And Ms. Johnson informed both Ms. Drakeford and Ms. Rankin that they should sign in and out with Ms. Johnson instead of at the Division Office. Pl.'s Ex. 9, at 2.

Later that day, Mr. Waters told Ms. Johnson that he had changed his mind. Compl. ¶ 16; Pl.'s Ex. 9, at 2. Instead of signing in and out with Ms. Johnson, Mr. Waters had decided that Ms. Drakeford and Ms. Rankin should continue to sign in and out at the Division Office. Compl. ¶ 16; Pl.'s Ex. 9, at 2. When Ms. Johnson asked him why he had changed his mind, he merely responded "[b]ecause I said so." Compl. ¶ 16.

Ms. Johnson also spoke with her second-line supervisor, Mr. Herman, on June 20, 2014. Pl.'s Ex. 4, at 2. She and Mr. Herman discussed what kind of leave they would charge Ms. Drakeford, and they agreed on charging her annual leave. *Id.* Ms. Johnson also mentioned her concerns about Mr. Waters allowing Ms. Drakeford to continuing signing in and out at the Division Office. *Id.* Mr. Herman told Ms. Johnson that he would speak with Mr. Waters about the issue. *Id.*

In July and August 2014, while her mother was in the hospital and after her mother died, Ms. Drakeford continued to take leave from work without getting Ms. Johnson's approval. Compl. ¶ 17; Pl.'s Ex. 4, at 2. On July 9, 2014, some of Ms. Johnson's other supervisees told Ms. Johnson that Ms. Drakeford would no longer ask Ms. Johnson for leave, because Mr. Waters had told Ms. Drakeford that asking Ms. Johnson was unnecessary. Pl.'s Ex. 4, at 2.

### F.  Treatment of Ms. Johnson's Male and Female Supervisees in General

According to Ms. Johnson, Mr. Water's decisions about Ms. Drakeford were consistent with other decisions made in the time around the June 2014 events. *See* Compl. ¶ 20. In 2014 and

2015, Ms. Johnson attempted to issue supervisory counseling memoranda to Ms. Drakeford and other female supervisees, but Mr. Waters and Mr. Herman processed these memoranda slowly or not at all. *Id.* In contrast, Mr. Waters and Mr. Herman reviewed Ms. Johnson's counseling memoranda to similarly situated male employees, edited them, and sent them to the Library's Human Resources department for final approval in less than a week. *Id.* Additionally, when some of Ms. Johnson's other supervisees—including Mr. Bunch—had a parent or spouse who died, Ms. Johnson reports that those supervisees were not given "any especial treatment . . . or favors." Pl.'s Ex. 4, at 2, ECF No. 9-7.

### G.  Discussions with Ms. Johnson's Supervisors

On August 6, 2014, Ms. Johnson met with both Mr. Waters and Mr. Herman to discuss Ms. Drakeford's continued unapproved leave. Compl. ¶ 19; Pl.'s Ex. 1, ¶ 14, ECF No. 9-4. But instead of agreeing with Ms. Johnson's position, Mr. Waters informed Ms. Johnson that he would approve Ms. Drakeford's leave. Compl. ¶ 19. He justified his position with statements about how Ms. Johnson had not taken similar actions with some of her other supervisees. Pl.'s Ex. 4, at 2, ECF No. 9-7. He also told Ms. Johnson that she was no longer Ms. Drakeford's supervisor. Compl. ¶ 19; Pl.'s Ex. 1, ¶ 14; Pl.'s Ex. 4, at 2, ECF No. 9-7. At the meeting, Mr. Herman "simply sat there," without doing anything "other than telling Mr. Waters that he had to be fair." Def.'s Ex. 1, at 5, ECF No. 8-1; *see also* Compl. ¶ 19.

On August 13, 2014, Ms. Johnson put her narrative in writing and sent an email to Mr. Sweeney about what had happened between herself, her supervisors, and her supervisees on detail with Ms. Haspo. Compl. ¶ 22; *see* Pl.'s Ex. 9, at 1–2, ECF No. 9-12. In response, Mr. Sweeney took three sets of actions:

    (1)    he noted the possible discrimination allegations in Ms. Johnson's email, and forwarded the email to the Library's Office of Opportunity,

Inclusiveness and Compliance (OIC), which is tasked with processing allegations of employment discrimination made by Library employees;

(2)    he directed Mr. Herman to write a memo clarifying Ms. Johnson's supervisory responsibilities for staff members on detail with Ms. Haspo; and

(3)    he reviewed Ms. Drakeford's registers and time sheets, determined that she was charged leave for all days she was not present, noted that she was not charged leave for one day for which the register was unclear, and indicated that he would work with Mr. Herman to resolve the ambiguity relating to that one day.

Compl. ¶ 22; Pl.'s Ex. 9, at 1; *see* Pl.'s Ex. 3, ECF No. 9-6 (showing that OIC handled Ms. Johnson's discrimination allegations); Pl.'s Ex. 5, ECF No. 9-8 (same). Having taken these actions, he considered the matter "closed" and directed Ms. Johnson to "work through [her] established management chain of command." Pl.'s Ex. 9, at 1.

### H. Aftermath

In a memorandum to Ms. Johnson dated August 27, 2014, Mr. Herman "establish[ed] the reporting structure . . . in place for staff members serving on developmental assignments" with Ms. Haspo. Pl.'s Ex. 8, ECF No. 9-11. The memorandum affirmed Mr. Waters's decision to have Ms. Johnson's supervisees "sign in and sign out in the CALM Division Office." *Id.* ¶ 1. It went on to state that, for Ms. Johnson's supervisees on detail, "[a]ll requests for leave and for other scheduling-related issues" would be "the responsibility of Rohn Roaché," Ms. Haspo's first-line supervisor. *Id.* ¶ 2; Def.'s Ex. 1, at 5. In Mr. Roaché's absence, Mr. Herman, as Mr. Roaché's immediate supervisor, would handle leave and scheduling issues. Pl.'s Ex. 8, ¶ 3; Def.'s Ex. 1, at 5. The memorandum further stated that day-to-day assignment of work and performance monitoring would rest with Ms. Haspo. Pl.'s Ex. 8, ¶ 4. After a supervisee completed his or her detail, Ms. Haspo would provide both Ms. Johnson and Mr. Roaché with "an assessment of how the employee performed." *Id.*

9

After the August 27, 2014 memorandum, Ms. Johnson's supervisees still at times contacted her to request leave, because they could not reach Mr. Roaché or Mr. Herman. Def.'s Ex. 1, at 5. Because Mr. Herman and Mr. Roaché were often in meetings and sometimes worked off-site, and because Mr. Roaché did not work on Tuesdays, Mr. Herman and Mr. Roaché were not as available as Ms. Johnson. *Id.*

### I. Administrative Proceedings

Alleging discrimination by Mr. Waters and Mr. Herman, Ms. Johnson filed an informal complaint on September 3, 2014 with the Library's Office of Opportunity, Inclusiveness and Compliance (OIC). *See* Pl.'s Ex. 1, ECF No. 9-4. On September 10, 2014, the OIC told Ms. Johnson by letter that, because no resolution of her informal complaint had been reached, she was "entitled to file a formal discrimination complaint." Pl.'s Ex. 3, ECF No. 9-6.

Ms. Johnson filed a formal discrimination complaint on September 16, 2014. *See* Pl.'s Ex. 4, ECF No. 9-7. But, on December 19, 2014, the OIC notified Ms. Johnson that it would not accept her formal complaint because she did not timely file it. *See* Compl. ¶ 10; Pl.'s Ex. 5, at 1, ECF No. 9-8. Ms. Johnson appealed the decision and argued that her formal complaint was in fact timely. Compl. ¶ 10. On March 2, 2015, after reconsidering Ms. Johnson's claims, the OIC affirmed that Ms. Johnson's appeal was denied. *See id.*; Def.'s Ex. 2, ECF No. 8-2. The OIC further specified that, even if Ms. Johnson had timely filed her formal complaint, it "would not be accepted for investigation due to [her] failure to show an adverse employment action." *Id.*

### J. 2015 Performance Appraisal

In 2015, Ms. Johnson received a lower overall rating on her performance appraisal for the rating period from March 1, 2014 through February 28, 2015: "Successful," instead of the "Commendable" that she had received in 2014. *See* Compl. ¶ 24. *Compare* Pl.'s Ex. 7, at 1, ECF

No. 9-10, *with* Def.'s Ex. 4, at 1, ECF No. 8-4 (reproducing Ms. Johnson's 2014 performance

appraisal). Her performance rating for her "Supervisory and Managerial Responsibilities" was

also "Successful," not "Commendable." Pl.'s Ex. 7, at 3. Ms. Johnson took offense to the lower

ratings and, on April 7, 2015, she refused to sign the performance appraisal. *See id.* at 6–7. In her

comments, she charged Mr. Waters with making a "personal" performance evaluation instead of

an "objective" one, because Ms. Johnson had filed informal and formal discrimination

complaints against him in September 2014. *Id.* at 6. She also noted that, for both the past two

rating periods in which Mr. Waters was her supervisor, she had received a "Commendable"

rating from Mr. Waters. *Id.*[5]

### K.  Procedural History

Ms. Johnson filed suit in this Court against the government on May 30, 2015. *See* Compl.

Her complaint brings three "claims for relief": (1) violation of Title VII of the Civil Rights Act

of 1964,[6] (2) intentional infliction of emotional distress, and (3) injunctive relief. *Id.* ¶¶ 26–39. In

the complaint, Ms. Johnson alleges that Mr. Waters and Mr. Herman showed "preferential

treatment to a female employee[]," which "created a hostile work environment and dissen[s]ion"

among Ms. Johnson's supervisees. *Id.* ¶ 21. The complaint further alleges that, after Ms. Johnson

filed her administrative complaints, "she has received continuous backlash from David Waters,"

including removal of her supervisory duties and a lower rating on a performance appraisal. *Id.*

¶ 24. Ms. Johnson cites her supervisors' actions as the basis for her claims of "sex discrimination

and retaliation in violation of . . . Title VII of the Civil Rights Act of 1964." *Id.* ¶¶ 24–32.

---

[5] In her opposition brief, Ms. Johnson further alleges that she received a "Successful" rating just once, "over 20 years ago," and that she "received a rating of 'Commendable' for all other years." Mem. P. & A. 7, ECF No. 9-1 [hereinafter Pl.'s Mem.].

[6] Pub. L. No. 88-352, Title VII, 78 Stat. 241, 253–66 (codified as amended at 42 U.S.C. §§ 2000e–2000e-17).

In stating her intentional infliction of emotional distress claim, Ms. Johnson's complaint contends that she "has suffered and continues to suffer severe emotional distress as a result of the Library's extreme and outrageous conduct." *Id.* ¶ 36. In stating her claim for injunctive relief, Ms. Johnson asks the Court "to enjoin the Library from similarly discriminating against its employees," alleges that "[m]ore irreparable harm will result during the pendency of this legal action due to the Library's illegal discriminatory actions against its employees," and argues that "[p]ublic interest will be served if relief is granted." *Id.* ¶¶ 38–39.

In its pre-answer motion, the Library seeks dismissal of Ms. Johnson's complaint, or, in the alternative, summary judgment in its favor on Ms. Johnson's claims. Mem. P. & A. Supp. Def.'s Mot. Dismiss, or in the Alternative for Summ. J. 1–4 & n.2, ECF No. 8 [hereinafter Def.'s Mem.]. The Library argues for dismissal of Ms. Johnson's Title VII claim and contends that she (1) failed to exhaust administrative remedies, (2) failed to make a prima facie showing of discrimination, (3) failed to show causation, and (4) cannot maintain a hostile work environment claim. *Id.* at 4–15.[7] The Library also argues that Title VII preempts Ms. Johnson's intentional infliction of emotional distress claim, and that, even if it did not, Ms. Johnson failed to exhaust administrative remedies for that claim under the Federal Tort Claims Act. *Id.* at 15–18. Lastly, the Library argues for dismissal of Ms. Johnson's claim for injunctive relief by contending that Ms. Johnson "shows no basis for this extraordinary relief she requests." *Id.* at 18.

---

[7] Because the Library has withdrawn the argument that Ms. Johnson failed to exhaust administrative remedies, the Court will not address that argument in this opinion. *See* Reply Mem. Supp. Def.'s Mot. Dismiss 1 n.1, ECF No. 11 [hereinafter Def.'s Reply Mem.] ("Defendant will withdraw its argument that Plaintiff failed to exhaust her administrative remedies."); Rubiella Decl., ECF No. 11-1 ("I have examined the administrative file . . . and have determined that Ms. Johnson's Complaint of Discrimination . . . was timely filed . . . ."). The Court also addresses the Library's hostile work environment argument only briefly, because Ms. Johnson has not advanced that theory of sex discrimination in her opposition brief. *See infra* note 10.

## III.  ANALYSIS

The Court addresses the parties' arguments for each claim in turn, beginning with Ms. Johnson's Title VII claim. For each claim, the Court must determine the proper legal standard before proceeding to the merits.

### A.  Title VII

#### 1.  Legal Standard

When, on a motion under Rule 12(b)(6), "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56" and the parties "must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Here, both parties have submitted evidence outside the pleadings in support of their positions, and they rely on them when discussing Ms. Johnson's Title VII claim. *See, e.g.*, Def.'s Mem. 12 (citing to Ms. Johnson's 2014 performance appraisal when arguing that she failed to show causation); Mem. P. & A. 6, ECF No. 9-1 [hereinafter Pl.'s Mem.] (citing to Mr. Herman's August 27, 2014 memorandum and to Mr. Sweeney's email when responding to the Library's Title VII argument). And though it is improper to convert a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction into a motion for summary judgment, *see Ord v. District of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009), the Library's arguments about Ms. Johnson's Title VII claim do not assert that this Court lacks jurisdiction over that claim. *See* Def.'s Mem. 8–15. Therefore, the Court finds that conversion of the Government's motion to a motion for summary judgment is appropriate. *See Allen v. Napolitano*, 774 F. Supp. 2d 186, 195 (D.D.C. 2011).[8]

---

[8] Although the Library seems to urge the Court to treat the Library's motion in its entirety as a motion to dismiss, *see* Def.'s Mem. 4 n.2, the Court notes that, if the Court did so, one of the Library's key arguments would immediately fall flat. Ms. Johnson, at the pleading stage, is not

Given that the Library's motion comes before discovery has commenced in this case, the Court pays special heed to the principle that, typically, "summary judgment may not be granted until all parties have had a full opportunity to conduct discovery." *United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 25 (D.C. Cir. 2014) (internal quotation marks omitted) (quoting *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012)). This principle is particularly relevant in a Title VII case, where "discovery may even uncover direct evidence of discrimination, thus entirely eliminating the need to prove a prima facie case." *Chappell–Johnson v. Powell*, 440 F.3d 484, 488–89 (D.C. Cir. 2006). The Court could thus deny the Library's motion for summary judgment on Ms. Johnson's Title VII claims simply because of this case's preliminary posture. But, to ensure that this case is not the atypical one in which pre-discovery summary judgment is proper, the Court will analyze the Library's arguments on their merits, using the legal standard applicable to Rule 56 motions for summary judgment. *Cf. Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1032 (D.C. Cir. 2003) (explaining that summary judgment "ordinarily" is proper only after discovery (internal quotation marks omitted) (quoting *Americable Int'l, Inc. v. Dep't of Navy*, 129 F.3d 1271, 1274 (D.C. Cir. 1997))).

---

required to plead a prima facie case of discrimination. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–12 (2002); *accord Jones v. Air Line Pilots Ass'n, Int'l*, 642 F.3d 1100, 1104 (D.C. Cir. 2011) ("[A]n employment discrimination plaintiff is not required to plead every fact necessary to establish a *prima facie* case to survive a motion to dismiss."). Thus, if the Court considered the Library's Title VII arguments under motion-to-dismiss legal standards, the Library's argument that Ms. Johnson failed to establish a prima facie case of discrimination or retaliation would be even less successful than it is under the summary judgment legal standard. *See generally* Def.'s Mem. 5–12 (arguing that Ms. Johnson failed to establish a prima facie case); *infra* Parts III.A.3–4 (explaining why the Library does not merit summary judgment on all of Ms. Johnson's Title VII claims at this time).

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The inquiry under Rule 56 is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

The principal purpose of summary judgment is to determine whether there is a genuine need for trial by disposing of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The non-movant may not rest upon mere allegations or denials but must instead present affirmative evidence. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (citing *Anderson*, 477 U.S. at 257).

In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). All underlying facts and inferences must be analyzed in the light most favorable to the non-movant. *See Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without

any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### 2.   Title VII Principles

The Court now turns to the merits of Ms. Johnson's Title VII claim. Title VII declares that "[a]ll personnel actions affecting employees . . . in . . . the Library of Congress shall be made free from any discrimination based on . . . sex . . . ." 42 U.S.C. § 2000e-16(a). This provision extends to Library of Congress employees "the full rights available in the courts as are granted to individuals in the private sector." *Loeffler v. Frank*, 486 U.S. 549, 558–59 (1988) (internal quotation marks omitted) (quoting *Chandler v. Roudebush*, 425 U.S. 840, 841 (1976)). These rights include those under Title VII's antiretaliation provision, which "forbids employer actions that 'discriminate against' an employee . . . because he has 'opposed' a practice that Title VII forbids or has 'made a charge . . . or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006) (quoting 42 U.S.C. § 2000e-3(a)).

The three-part *McDonnell Douglas* burden-shifting framework applies when a Title VII plaintiff offers only indirect evidence of discrimination at summary judgment, which Ms. Johnson does here. *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003). *See generally* Compl. ¶¶ 11–32; Pl.'s Mem. 4–8 (discussing only circumstantial and indirect evidence of discrimination). Under *McDonnell Douglas*, the plaintiff has the initial burden of production to establish a prima facie case of discrimination; if she does, then the employer must articulate a legitimate, non-discriminatory reason for its action; and if it does, then the plaintiff must receive an opportunity to show that the employer's reason was a pretextual cover for discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). Although *McDonnell*

16

*Douglas* shifts the burden of production between the parties, the plaintiff retains the burden of persuasion. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993).[9]

A plaintiff establishes a prima facie case of disparate-treatment sex discrimination by establishing (1) that she is a member of a protected class, *i.e.*, that she is a woman, (2) that she suffered an adverse employment action, and (3) that the unfavorable action gives rise to an inference of discrimination. *See Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007); *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1512 (D.C. Cir. 1995). She establishes a prima facie case of retaliation by showing (1) that she opposed a practice made unlawful by Title VII, (2) that her employer took a materially adverse action against her, and (3) that a causal link connects the plaintiff's opposition to the unlawful practice and the materially adverse action. *McGrath v. Clinton*, 666 F.3d 1377, 1380 & n.3 (D.C. Cir. 2012); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). For a retaliation claim, the materially adverse action need not be workplace-related or employment-related, but it must be an action that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"

---

[9] The Court must forgo the *McDonnell Douglas* framework when, in considering a motion for summary judgment, the Court immediately observes that a plaintiff suffered an "adverse employment action" and her employer asserted a "legitimate, non-discriminatory reason" for the alleged discrimination. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (directing the Court, in those circumstances, to resolve simply whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of . . . sex"). Because the Library has not advanced a legitimate, non-discriminatory reason for Ms. Johnson's discrimination allegations, but instead attacks her prima facie case, *see* Def.'s Mem. 5–15, *Brady*'s condensed analysis is inapplicable here. *See generally Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016) (applying *Brady* "[i]n reviewing a summary judgment motion where the defendant has proffered some legitimate reason for its adverse employment action"); *Brady*, 520 F.3d at 494 n.2 (noting that the plaintiff must still establish a prima facie case in "those cases in which the defendant does not assert *any* legitimate, nondiscriminatory reason for the [employment] decision"); *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 77 (D.D.C. 2015) (same).

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006) (quoting *Rochon v.*

*Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Under either theory of Title VII liability, the

plaintiff's burden to establish a prima facie case "is not onerous." *Wiley v. Glassman*, 511 F.3d

151, 126–27 (D.C. Cir. 2007) (per curiam) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450

U.S. 248, 253 (1981)); *accord Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 n.2 (D.C.

Cir. 2008).

### 3.  Sex Discrimination[10]

The Library's principal argument for summary judgment on Ms. Johnson's sex

discrimination claim is that she fails to make a prima facie showing of discrimination because

she has not shown that the Library took an adverse employment action against her. *See* Def's

---

[10] Title VII sex discrimination claims typically allege disparate treatment on the basis of sex, *see, e.g.*, *Holbrook v. Reno*, 196 F.3d 255, 260–62 (D.C. Cir. 1999), but Title VII also provides a cause of action based on a hostile or abusive work environment, when the harassment is so abusive that it affects a "term, condition, or privilege" of employment, *see Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122 (D.C. Cir. 2002) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)). Ms. Johnson's complaint alleges that her supervisors' actions "have created a hostile work environment," Compl. ¶ 21, but she seems to abandon this line of argument in her opposition brief. *Compare* Pl.'s Mem. 4–8 (declining to pursue her hostile work environment allegation), *with* Def.'s Mem. 13–15 (arguing for dismissal of Ms. Johnson's hostile work environment claim).

Because the Court will not enter summary judgment on all of Ms. Johnson's Title VII claims at this time, the Court need not address the merits of any hostile work environment allegations. The Court does note, however, that, if Ms. Johnson's Title VII claim were solely a hostile work environment claim, she would have failed to establish a prima facie case. Ms. Johnson's complaint and evidence do not allege that she was a victim of sexual harassment, nor do they develop many of the elements of a prima facie hostile work environment case. *See, e.g.*, Compl. ¶¶ 11–32; Pl.'s Ex. 9, at 1–2, ECF No. 9-12. *See generally Davis*, 275 F.3d at 1122–23 (explaining that a plaintiff establishes a prima facie hostile work environment case by showing that (1) she is a member of a protected class; (2) she received unwelcome sexual harassment; (3) the harassment was because of her sex; (4) the harassment unreasonably interfered with her work performance and created an intimidating, hostile, or offensive work environment; and (5) respondeat superior liability exists).

Mem. 8–12.[11] The Court briefly summarizes the law on this element of Ms. Johnson's prima facie case before analyzing how her alleged adverse employment actions—removal of supervisory duties and a lower rating on her performance appraisal, *see* Compl. ¶¶ 24, 31—fare under that law.

For a discrimination claim, an adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Baird v. Gotbaum*, 662 F.3d 1246, 1248 (D.C. Cir. 2011) (internal quotation marks omitted) (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)). The plaintiff must "experience materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Douglas*, 559 F.3d at 552 (brackets omitted) (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002)). "Objectively tangible harm" tends to "relate to one's work responsibilities and position" and "cause a significant change in employment status." *Id.* at 552–53 (noting that award or denial of a bonus or pay raise, like hiring, firing, failing to promote, and reassignment with significantly different responsibilities, could show objectively tangible harm because it has a measurable effect on compensation). Adverse employment actions do not encompass "mere idiosyncrasies of personal preference" and "[p]urely subjective

---

[11] The Library's argument that Ms. Johnson has "presented no evidence of causation," Def.'s Mem. 12–13, is relevant to Ms. Johnson's retaliation allegations, but not to her discrimination allegations. *See Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007) (articulating the elements of a prima facie sex discrimination case without including causation as one of them). And because, as discussed below, the Court will not enter summary judgment on Ms. Johnson's sex discrimination claim at this time, the Court will not discuss the merits of any hostile work environment claim, which the Library also addresses in its brief. *See* Def.'s Mem. 13–15; *supra* note 10.

injuries," such as "dissatisfaction with a reassignment, or public humiliation or loss of reputation." *Forkkio*, 306 F.3d at 1130–31 (brackets, citations, and internal quotation mark omitted) (quoting *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)).

### a. Removal of Supervisory Duties

As one of her alleged adverse employment actions, Ms. Johnson submits that the Library removed Ms. Johnson's supervisory duties over Ms. Drakeford when Mr. Waters told Ms. Johnson that "she was no longer Ms. Drakeford's supervisor." Compl. ¶¶ 19, 24, 31. In cases involving lateral transfers, withdrawal of supervisory duties can be an adverse employment action. *See Czekalski v. Peters*, 475 F.3d 350, 355 (D.C. Cir. 2007). Similarly, in reassignment cases, a plaintiff suffers an adverse employment action if, at her new position, she has significantly changed benefits or significantly different responsibilities. *See Youssef v. FBI*, 687 F.3d 397, 401 (D.C. Cir. 2012); *Ginger v. District of Columbia*, 527 F.3d 1340, 1343 (D.C. Cir. 2008); *Czekalski*, 475 F.3d at 355. "[I]f a reasonable juror could find that the reassignment left the plaintiff with significantly diminished responsibilities," then the jury must decide whether the reassignment was an adverse action; "[t]he court may not take that question away from the jury." *Czekalski*, 475 F.3d at 356.

At this time, on the limited evidence available, a reasonable juror could find that the removal of some of Ms. Johnson's supervisory duties caused such a significant change in her employment status that it was an adverse employment action. To be sure, the Library argues that "Ms. Drakeford was not removed as a direct report to Ms. Johnson," and that Mr. Herman's August 27, 2014 memorandum "expressly acknowledged that Ms. Drakeford's performance continued to be within Ms. Johnson's purview." Def.'s Mem. 8. But Mr. Herman's memorandum belies this characterization of the facts; it envisions a very limited role for Ms. Johnson as

supervisor to Ms. Drakeford and other supervisees on detail. Contrary to the Library's position,

Ms. Johnson would not "receive feedback on Ms. Drakeford's performance during the

developmental assignment," *id.*; she would receive only a one-time "assessment of how

[Ms. Drakeford] performed" during her detail "at the end" of the time Ms. Drakeford was on

detail with Ms. Haspo, Def.'s Ex. 3, ECF No. 8-3. Nor would Ms. Johnson have responsibility

any longer for Ms. Drakeford's sign-in and sign-out timekeeping. *See id.*; *cf.* Pl.'s Ex. 9, at 2,

ECF No. 9-12 (noting that Ms. Johnson had functioned as a supervisor and timekeeper for "the

four previous staff members" who had been detailed to work with Ms. Haspo). Mr. Herman's

memorandum implies that, practically speaking, Ms. Johnson ceased to function as

Ms. Drakeford's supervisor during the time Ms. Drakeford was on detail. And the memorandum

impacted not just Ms. Drakeford, but also any supervisees of Ms. Johnson who would be detailed

to Ms. Haspo in the future. *See* Def.'s Ex. 3 (establishing the reporting structure for all "staff

members serving on developmental assignments . . . managed by . . . Beatriz Haspo," not just the

reporting structure for Ms. Drakeford).

  The record does not specify exactly how many Library employees Ms. Johnson

supervised. It does, however, make clear that supervisory and managerial responsibilities were a

major area of responsibility for Ms. Johnson: twenty-five percent of her overall performance

rating rested on those responsibilities. *See* Pl.'s Ex. 10, at 2–3, ECF No. 9-13. And whether she

succeeded in her supervisory and managerial responsibilities derived, to some extent, from how

"[e]ffectively [she] set[] schedules to meet the needs of the division"—*i.e.*, how effectively she

managed her supervisees' work and leave time to ensure the Library's goals were met. *See id.* at

3. With two of Ms. Johnson's supervisees at a time serving detail assignments, and no end date

for the detail assignments forecasted, Mr. Herman's memorandum stripped Ms. Johnson of

supervisory responsibilities for two supervisees indefinitely. *See* Pl.'s Ex. 9, at 2 (indicating that

Ms. Johnson's supervisees typically went on detail in groups of two); Def.'s Ex. 3 (including no

end date for the developmental assignments with Ms. Haspo).

Based on this skeletal record, a reasonable juror could potentially find, on the evidence

presented, that Ms. Johnson experienced the equivalent of a lateral transfer or a reassignment in

which she received "significantly different responsibilities" and in which the Library withdrew

many of her former supervisory duties. *See Czekalski*, 475 F.3d at 364 (quoting *Forkkio*, 305

F.3d at 1131). The change in Ms. Johnson's employment duties related to her "work

responsibilities and position," and thus a reasonable juror could potentially find it "obvious" that

it significantly changed her employment status. *Douglas*, 559 F.3d at 552. Given these potential

findings (if based on a fuller record), Ms. Johnson's change in supervisory duties would be

"conclusively presumed to be [an] adverse employment action[], even if any alleged harm is

speculative." *Id.* at 552–53. Hence, contrary to the Library's argument, Ms. Johnson need not

show that the Library's actions would result "in a diminution in pay or benefits" or would

"affect[] . . . future employment opportunities." Def.'s Mem. 9.[12]

Given that a reasonable juror could potentially find on a fuller record that the Library

took an adverse employment action against Ms. Johnson, a reasonable juror could also proceed

---

[12] Of course, Ms. Johnson's situation does not neatly fall into a "lateral transfer" or "reassignment" category. *See Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007) (discussing adverse employment actions in the context of these two categories of employer actions). But facts cognizable as Title VII discrimination need not fall under preordained categories. Indeed, the statute itself broadly bars discrimination "with respect to [the plaintiff's] compensation, *terms, conditions, or privileges* of employment," in addition to discrimination in hiring and firing decisions. 42 U.S.C. § 2000e-2(a)(1) (emphasis added). And, as the D.C. Circuit has declared, "[s]o long as a plaintiff meets the statutory requirement of being 'aggrieved' by an employer's action, we do not categorically reject a particular personnel action as nonadverse simply because it does not fall into a cognizable type." *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (citations omitted) (quoting 42 U.S.C. § 2000e-16(c)).

to find that Ms. Johnson established each of the three elements of a prima facie case of sex discrimination: First, she is a woman, and therefore a member of a protected class. *See Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1512 (D.C. Cir. 1995). Second, Ms. Johnson's loss of supervisory duties can be the requisite adverse employment action. Third, a reasonable juror could infer discrimination from the Library's actions because, for Ms. Johnson's supervisees on detail, the Library transferred Ms. Johnson's timekeeping responsibilities to Rohn Roaché, a male supervisor. *See* Def.'s Ex. 3, ECF No. 8-3. *See generally Czekalski*, 475 F.3d at 366 ("[A] plaintiff can satisfy the third prong of the prima facie test . . . by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class . . . ." (internal quotation mark omitted) (quoting *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005))).

To rebut this prima facie showing of discrimination, the Library has offered no legitimate, non-discriminatory reason for the change in Ms. Johnson's supervisory duties. *See* Def.'s Mem. 5–12.[13] Based on the current record, therefore, "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Accordingly, the Court must deny the Library summary judgment on Ms. Johnson's sex discrimination claim. *See id.*; *see also Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007) ("Whether a particular reassignment of duties constitutes an adverse action for purposes of Title VII is generally a jury question."). But the Court reiterates

---

[13] Although Mr. Herman's August 27, 2014 memorandum indicates that the Library implemented changes to Ms. Johnson's supervisory duties "[t]o ensure the most efficient and consistent record keeping" for Ms. Johnson's supervisees on detail, Def.'s Ex. 3, ECF No. 8-3, the Library's brief does not adopt this argument. *See* Def.'s Mem. 4–15 (declining to make this argument when urging dismissal of Ms. Johnson's Title VII claim).

that this is a preliminary conclusion based on a vastly inadequate record. The Court's views may

change based on a full record after discovery.

### b.  Lower Rating on Performance Appraisal

Ms. Johnson's complaint names a lower rating on her performance appraisal as another

adverse employment action the Library took against her. *See* Compl. ¶¶ 24, 31. The D.C. Circuit

has more than once noted that "performance evaluations ordinarily are not actionable under Title

VII" because the harm they cause is often speculative. *Douglas v. Donovan*, 559 F.3d 549, 552

(D.C. Cir. 2009); *see Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (explaining that

poor performance evaluations should not be considered adverse actions when they do not affect

the employee's grade or salary); *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) ("The

result of an evaluation is often speculative, making it difficult to remedy."). But, more recently,

the Circuit has cautioned that even an unchanged performance evaluation could be an adverse

employment action: "An employee whose volume and quality of work demonstrably improved,

or who had significant difficulties at work in the prior period that she had overcome, might fairly

deserve a significantly improved rating and would be materially harmed if discrimination

prevented appropriate recognition." *Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015). In

determining whether a performance evaluation is actionable under Title VII, therefore, the

critical question is whether the evaluation "caused a significant, tangible harm." *Id.*

Ms. Johnson has not produced evidence showing that her lowered performance rating

caused "significant, tangible harm." *Id.* Although the evidence suggests that Ms. Johnson's

overall rating of "Successful" on her 2015 performance appraisal is lower compared to her past

ratings of "Commendable," *see* Pl.'s Ex. 7, at 6, ECF No. 9-10, Ms. Johnson has not alleged that

the lower rating will lead to economic harm, or even decreased responsibilities on the job. Nor

has she alleged that her "volume and quality of work demonstrably improved," or that she "had significant difficulties at work in the prior period that she had overcome." *Walker*, 798 F.3d at 1095. Indeed, Ms. Johnson's opposition brief does not even advance the argument that her lower performance appraisal rating is an adverse employment action cognizable in Title VII sex discrimination. *See* Pl.'s Mem. 4–11 (discussing Ms. Johnson's performance appraisal in the context of her retaliation allegations only). On the record presented, therefore, Ms. Johnson's lowered rating is not an adverse employment action that can ground a prima facie sex discrimination claim. Thus, to the extent that Ms. Johnson's sex discrimination claim is based on her lowered performance rating, that claim is dismissed. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (indicating that, even though a plaintiff need not establish a prima facie case to defend against a motion for summary judgment, she still must show that she "has suffered an adverse employment action").

### 4.  Retaliation

The Court now turns to the Library's arguments about Ms. Johnson's Title VII retaliation allegations. As the Library did for Ms. Johnson's discrimination claim, the Library argues that her retaliation claim must fail because she cannot show the adverse action necessary to establish a prima facie case. Def.'s Mem. 8–12. The Library also argues that she has presented "no evidence of causation," a necessary element of a prima facie retaliation case. *Id.* at 12–13; *see McGrath v. Clinton*, 666 F.3d 1377, 1380 & n.3 (D.C. Cir. 2012); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). But, for Ms. Johnson's retaliation claim based on the removal of her supervisory duties, neither argument proves that the Library merits summary judgment.

*a.  Materially Adverse Action*

As one element of a prima facie case of retaliation under Title VII, the plaintiff must

show that her employer took a materially adverse action against her. *McGrath v. Clinton*, 666

F.3d 1377, 1380 & n.3 (D.C. Cir. 2012); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

Although an adverse action is a critical element of the prima facie case for both Title VII

discrimination and Title VII retaliation, "Title VII's substantive [antidiscrimination] provision

and its antiretaliation provision are not coterminous" in the set of employer actions they forbid.

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006); *see also id.* at 61–62

(juxtaposing the two provisions and observing that, though the substantive provision's text

"limit[s] the scope of that provision to actions that affect employment or alter the conditions of

the workplace," "[n]o such limiting words appear in the antiretaliation provision"). The Court

must therefore analyze whether, separate from Ms. Johnson's prima facie discrimination case,

Ms. Johnson's alleged adverse actions suffice for a prima facie retaliation case. As before, the

Court begins with general principles before analyzing whether Ms. Johnson's alleged adverse

employer actions can sustain a prima facie case of retaliation.

"The scope of the antiretaliation provision extends beyond workplace-related or

employment-related retaliatory acts and harm." *Id.* at 67. It does not, however protect an

employee "from all retaliation"—only "from retaliation that produces an injury or harm." *Id.*

Along these lines, Title VII's antiretaliation provision protects employees from *materially*

adverse harms, which might have "dissuaded a reasonable worker from making or supporting a

charge of discrimination." *Id.* at 68 (internal quotation marks omitted) (quoting *Rochon v.*

*Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Because the harm must be "material," "petty

slights, minor annoyances, and simple lack of good manners" do not rise to the level of materially adverse employer actions. *See id.*

But no bright line separates materially adverse employer actions from immaterial actions: "Context matters." *Id.* at 69. An "act that would be immaterial in some situations is material in others." *Id.* (internal quotation marks omitted) (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005)). Nonetheless, determining whether an action is materially adverse "does not require consideration . . . of the severity of the underlying act of discrimination to which the employee objected, or . . . of the courage that [a] particular employee demonstrated by reporting it (and hence of her asserted imperviousness to acts of retaliation)." *Steele v. Schafer*, 535 F.3d 689, 696 (D.C. Cir. 2008).

i.  Removal of Supervisory Duties

Although Ms. Johnson's filings are not models of clarity, one may infer from her complaint that she views the removal of her supervisory duties as a potential act of retaliation, as well as a potential act of sex discrimination. *See* Compl. ¶ 24 (alleging that Ms. Johnson "has received continuous backlash from David Waters, which includes the . . . act of taking away her staff"); *cf.* Pl.'s Mem. 4–8 (discussing the removal of Ms. Johnson's supervisory duties, but without clearly specifying whether Ms. Johnson views the action as one of discrimination or retaliation). From the retaliation perspective, Ms. Johnson appears to argue that, in response to her concerns about disparate treatment of Ms. Johnson's male and female supervisees, the Library removed her supervisory duties to cover up its "prior discriminatory animus." *See* Pl.'s Mem. 5–6.

The Court must therefore assess based on the extremely limited record before it whether the removal of Ms. Johnson's supervisory duties is a materially adverse action for purposes of a

Title VII retaliation claim. As discussed earlier, a reasonable juror could find that the change in supervisory duties was an adverse employment action in a discrimination case. *See supra* Part III.A.3.a. Consequently, a reasonable juror could also find that, in a retaliation case, the change in supervisory duties was a materially adverse action. After all, "[t]he scope of the antiretaliation provision extends beyond" the scope of Title VII's antidiscrimination provision. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). And given that Ms. Johnson lost supervisory responsibilities for two supervisees indefinitely, in a year when twenty-five percent of her overall performance rating depended on how well she performed her supervisory responsibilities, the lost supervisory responsibilities "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Thus, based on this limited record, the Court concludes that a reasonable juror could find that Ms. Johnson has established the materially adverse action necessary to maintain a prima facie retaliation claim under Title VII. But the Court's view could change based on a fuller record.

ii.  Lower Rating on Performance Appraisal

Ms. Johnson also alleges that the lower rating on her 2015 performance appraisal was a retaliatory act. *See* Compl. ¶ 24 (contending that "a lower rating on Johnson's Performance Appraisal" was also "backlash from David Waters"). But just as the lower performance rating was not an adverse personnel action that could sustain Ms. Johnson's prima facie discrimination case, it also is not cognizable as a materially adverse action that can sustain her prima facie retaliation case.

Although the law articulates the adverse actions required for prima facie discrimination and retaliation cases differently, *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53,

61–67 (2006), both types of adverse action must cause a "significant, tangible harm" to comprise part of a prima facie case. *See Walker v. Johnson*, 798 F.3d 1085, 1095 (D.C. Cir. 2015) (explaining that "[w]hether an assessment is adverse" hinges on "whether discrimination *or retaliation* caused a significant, tangible harm" (emphasis added)). As the Court stated earlier, Ms. Johnson lacks evidence of "significant, tangible harm" flowing from her lower rating. *See supra* Part III.A.3.b. The rating thus is not a materially adverse action and is not cognizable as Title VII retaliation.

Nonetheless, because the removal of Ms. Johnson's supervisory duties *is* cognizable as a materially adverse action, the Court next analyzes whether she can show causation, another necessary element of a prima facie retaliation case.

### b. Causation

To reiterate, a plaintiff establishes a prima facie case of retaliation by showing (1) that she opposed a practice made unlawful by Title VII, (2) that her employer took a materially adverse action against her, and (3) that a causal link connects the plaintiff's opposition to the unlawful practice and the materially adverse action. *McGrath v. Clinton*, 666 F.3d 1377, 1380 & n.3 (D.C. Cir. 2012); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). If the plaintiff's opposition activity and the employer's materially adverse action occurred close in time, then their temporal proximity can support an inference of causation. *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012). Although a two-month gap can support an inference of causation, *id.* at 1358, and a twenty-month gap suggests no causality, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) (per curiam), the Court must evaluate "the specific facts of each case to determine whether inferring causation is appropriate," *Hamilton*, 666 F.3d at 1358.

The Library argues that Ms. Johnson cannot show temporal proximity because "the retaliatory act occur[red] *after* the protected activity, and not <u>before</u>." Reply Mem. Supp. Def.'s Mot. Dismiss 8, ECF No. 11 [hereinafter Def.'s Reply Mem.]. But the Library's argument assumes that Ms. Johnson's protected opposition activity—*i.e.*, the activity that allegedly spurred the Library's materially adverse action—was her informal discrimination complaint, which she filed on September 3, 2014. *See* Def.'s Mem. 12–13; Def.'s Reply Mem. 7–8; Pl.'s Ex. 1, ECF No. 9-4 (reproducing Ms. Johnson's informal complaint). In doing so, the Library overlooks where Ms. Johnson explains that the removal of her supervisory duties came *after* she raised concerns about Mr. Waters's "refus[al] to execute the identical appropriate disciplinary actions upon . . . female employees that had been enforced against similarly situated male employees." Pl.'s Mem. 5. From this chain of events, Ms. Johnson argues that the removal of her supervisory duties "was . . . motivated by the prior discriminatory animus, disparate treatment of [her] female and male staff by David Waters." *Id.* at 6. Instead of offering Ms. Johnson's informal discrimination complaint as her protected opposition activity, Ms. Johnson points to her conversations with Mr. Waters about possible disparate treatment of Ms. Johnson's female and male supervisees. *See id.* at 5–6; Compl. ¶¶ 16–17 (alleging that, on June 20, 2014, "Johnson reminded David Waters that he agreed to have the male employees sign-in and sign-out with her directly in order for their time to be monitored accurately," but "he did not impose the same requirement for Ms. Drakeford"). This narrative changes the temporal proximity analysis, making it less of an easy win for the Library. Indeed, it provides a solid foundation for the causation element in Ms. Johnson's prima facie retaliation case.

Title VII's antiretaliation provision protects employee opposition to any practice that Title VII made unlawful. *See* 42 U.S.C. § 2000e-3(a). The Supreme Court has made clear that

Case 1:15-cv-00796-RC   Document 13   Filed 03/31/16   Page 31 of 39


the opposition need not be the initiation of a written discrimination complaint; it can be more informal, such as "standing pat . . . by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons." *Crawford v. Metro. Gov't*, 555 U.S. 271, 277 (2009). And the Supreme Court has noted that "employees will often face retaliation not for opposing discrimination they themselves face, but for reporting discrimination suffered by others." *Id.* at 279 n.3.

Here, therefore, Title VII's antiretaliation provision likely protected Ms. Johnson's opposition to what she perceived to be disparate treatment of her female and male supervisees, expressed through her conversations with her supervisors on June 20, 2014, August 6, 2014, and August 13, 2014. *See* Compl. ¶¶ 16–17 (stating that, on June 20, 2014, Ms. Johnson spoke with Mr. Waters about Ms. Drakeford's treatment); *id.* ¶ 19 (stating that, on August 6, 2014, Ms. Johnson met with Mr. Herman and Mr. Waters about Ms. Drakeford's treatment); *id.* ¶ 22 (stating that, on August 13, 2014, Ms. Johnson told Mr. Sweeney about Ms. Drakeford's treatment). At least, for purposes of this motion, the Library does not argue otherwise. Even if, as the Library contends, Mr. Waters and Mr. Herman were not favoring Ms. Johnson's female supervisees, "opposition activity may be protected even though the employer's practices do not amount to a violation of Title VII" when "the employee-plaintiff . . . [has] a good faith and reasonable belief that the practices are unlawful." *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 24 (D.C. Cir. 2013); *cf.* Def.'s Mem. 14–15 (arguing that evidence contradicts Ms. Johnson's allegation that her supervisors favored her female supervisees over her male supervisees). No evidence in the record indicates that Ms. Johnson lacked a reasonable belief that her supervisors' practices were unlawful; her submissions, which contain detailed explanations about how and why her views arose, show Ms. Johnson's consistent beliefs about

her supervisees' disparate treatment based on their sex. *See generally* Pl.'s Ex. 1, ¶ 14, ECF No. 9-4 (juxtaposing treatment of Ms. Johnson's female and male supervisees); Pl.'s Ex. 4, at 2, ECF No. 9-7 (same); Pl.'s Ex. 9, at 1–2, ECF No. 9-12 (same). Thus, for purposes of this motion, it is undisputed that Ms. Johnson's communications with her supervisors on June 20, 2014, August 6, 2014, and August 13, 2014 were all opposition activities Title VII protected.

Having established that Ms. Johnson engaged in protected opposition activities in June 2014 and early August 2014, the temporal proximity analysis becomes simple. As discussed above, Ms. Johnson has preliminarily established a materially adverse action for her prima facie retaliation case: the removal of her supervisory duties over supervisees on detail with Ms. Haspo. *See supra* Part III.A.4.a.i. That removal happened, in part, on August 6, 2014, when Mr. Waters told Ms. Johnson that she was no longer Ms. Drakeford's supervisor. Compl. ¶ 19; Pl.'s Ex. 1, ¶ 14; Pl.'s Ex. 4, at 2. And, on August 27, 2014, Mr. Herman's memorandum extended Mr. Waters's decision to remove Ms. Johnson's supervisory duties over Ms. Drakeford to all of Ms. Johnson's supervisees on detail. *See* Pl.'s Ex. 8, ECF No. 9-11.

Given this timeline, Ms. Johnson's protected opposition activities all came shortly before employer actions that removed some of her supervisory duties. First, Ms. Johnson's initial June 20, 2014 conversation with Mr. Waters about perceived disparate treatment, *see* Compl. ¶¶ 16–17, occurred about two months before she lost supervisory duties on August 6, 2014 and August 27, 2014. Second, her August 6, 2014 statements expressing concern about the disparate treatment immediately preceded Mr. Waters's statement removing Ms. Johnson's supervisory duties over Ms. Drakeford that very day. *Id.* ¶ 19. Third, Ms. Johnson's August 13, 2014 email to Mr. Sweeney about the situation occurred just two weeks before Mr. Herman's August 27, 2014 memorandum removing her supervisory duties for all her supervisees on detail. *See* Pl.'s Ex. 8;

Pl.'s Ex. 9. Given the relatively small time period between Ms. Johnson's protected activities and her later loss of supervisory duties, a reasonable juror could infer that Mr. Waters and Mr. Herman retaliated against Ms. Johnson in response to her discrimination allegations, which she had recently expressed to her supervisors through conversation and email.

Ms. Johnson has thus made out each of the three elements of a prima facie retaliation case: (1) she opposed her supervisors' disparate treatment of her female and male supervisees, (2) her supervisors removed her supervisory duties over supervisees on detail, and (3) these two sets of actions occurred close enough in time that a reasonable juror could infer retaliation. In response to her prima facie case, the Library has offered no legitimate, non-discriminatory reason for the alleged retaliation. *See* Def.'s Mem. 5–12. On the record as it stands now, a reasonable juror could find at trial that Ms. Johnson has proven her retaliation claim. Because "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," summary judgment for the Library on Ms. Johnson's retaliation claim based on the removal of her supervisory duties is not warranted at this time. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## B.  Intentional Infliction of Emotional Distress

Ms. Johnson's complaint also brings a common law tort claim for intentional infliction of emotional distress. *See* Compl. ¶¶ 33–36. The Library argues—correctly—that Title VII provides the exclusive remedy for this claim and so the claim must be dismissed. *See* Def.'s Mem. 15–16. Before addressing the Library's argument, however, the Court must specify the legal standard applicable to this portion of the Library's motion.

### 1.  Legal Standard

Where the Library's briefs address Ms. Johnson's claim for intentional infliction of
emotional distress, they do not cite "matters outside the pleadings." Fed. R. Civ. P. 12(d); *see*
Def.'s Mem. 15–18; Def.'s Reply Mem. 9. Federal Rule of Civil Procedure 12(d) accordingly
does not require the Court to treat the Library's motion, where it argues to dismiss Ms. Johnson's
emotional distress claim, as a motion for summary judgment. *See* Fed. R. Civ. P. 12(d).

Having determined that the Library's motion, as it relates to Ms. Johnson's emotional
distress claim, is a motion to dismiss, the Court must decide which legal standard to apply: the
one for motions under Rule 12(b)(1) arguing lack of subject-matter jurisdiction, or the one for
motions under Rule 12(b)(6) arguing the plaintiff's failure to state a claim. *See* Fed. R. Civ. P.
12(b)(1); Fed. R. Civ. P. 12(b)(6). The Library brings its motion under both Rules. *See* Def.'s
Mot. Dismiss 1 ("Defendant . . . respectfully moves the Court, pursuant to Rules 12(b)(1) and
12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing Plaintiff's
Complaint . . . ."). The citation to both rules makes sense here because the Library's motion
brings two alternative arguments attacking Ms. Johnson's emotional distress claim: (1) Title VII
preempts her claim, because it provides the exclusive remedy for federal employees bringing
employment discrimination claims, Def.'s Mem. 15–16, and (2) even if Title VII did not preempt
her claim, the Court lacks jurisdiction, because sovereign immunity shields the federal
government from suit and Ms. Johnson's claim does not fall within the Federal Tort Claims Act
(FTCA)'s waiver of sovereign immunity, *id.* at 16–18.[14]

---

[14] The FTCA does not appear to apply here: "under the Federal Employees Compensation
Act ("FECA"), 5 U.S.C. § 8101, *et seq.*, federal employees are statutorily precluded from
bringing suits for money damages for injuries sustained during the course of their employment,"
and thus they cannot rely on the FTCA to bring work-related tort claims. *See Davis v. United
States*, 973 F. Supp. 2d 23, 28 (D.D.C. 2014); *see also id.* at 28 n.4 (noting that the D.C. Circuit

The Library's first argument is properly analyzed under Rule 12(b)(6); the second under Rule 12(b)(1). *See King v. Holder*, 950 F. Supp. 2d 164, 170, 173 (D.D.C. 2013) (dismissing under Rule 12(b)(6) "common law tort claims . . . based on the exact same conduct as the Plaintiff's Title VII claims"); *Clayton v. District of Columbia*, 931 F. Supp. 2d 192, 200 (D.D.C. 2013) ("If sovereign immunity has not been waived, a claim is subject to dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction."). Because the Court finds the first argument sufficient to dismiss Ms. Johnson's claim, *see infra* Part III.B.2, the Court applies only the Rule 12(b)(6) legal standard.

In considering a motion to dismiss under Rule 12(b)(6), the Court presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). A Rule 12(b)(6) motion does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Brewer v. District of Columbia*, 891 F. Supp. 2d 126, 130 (D.D.C. 2012).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true

---

"has not yet decided whether FECA covers claims for [intentional infliction of emotional distress]," but nonetheless observing that FECA "does not seem to distinguish [intentional infliction of emotional distress] from other intentional torts on its face"). And though the Library of Congress, as a creature of Congress instead of the Executive Branch, has several unique aspects, the Court notes that the FECA appears to apply to employees "in any branch of the Government of the United States." 5 U.S.C. § 8101(1)(A).

(even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56 (citations and footnote omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555.

### 2.  Claim Subsumed in Title VII Claim

The Library moves to dismiss Ms. Johnson's emotional distress claim because "Title VII preempts" it. Def.'s Mem. 15–16. Title VII does "provide[] the exclusive judicial remedy for claims of discrimination in federal employment." *Brown v. GSA*, 425 U.S. 820, 835 (1976); *accord Ramey v. Bowsher*, 915 F.2d 731, 734 (D.C. Cir. 1990) (per curiam); *King v. Holder*, 950 F. Supp. 2d 164, 173 (D.D.C. 2013). Hence, when a common law tort claim arises out of the same conduct as the plaintiff's Title VII claim, Title VII preempts that claim. *See King*, 950 F. Supp. 2d at 173. Along these lines, "[a]ny emotional injuries arising from the alleged [Title VII claim] are subsumed within Title VII," though this principle does not extend to emotional distress based on "alleged assaultive conduct" or other conduct that Title VII does not redress. *Boyd v. O'Neill*, 273 F. Supp. 2d 92, 96 (D.D.C. 2003); *accord Jackson v. Am. Chem. Soc'y*, 812 F. Supp. 239, 243 (D.D.C. 1993); *Stewart v. Thomas*, 538 F. Supp. 891, 895–96 (D.D.C. 1982). Thus, a victim of discrimination can maintain a common law tort claim only when the claim alleges a harm that Title VII does not remedy. *See Boyd*, 273 F. Supp. at 96–97; *Stewart*, 538 F. Supp. at 895–96.

Ms. Johnson's tort claim does not allege such a harm. In her complaint, Ms. Johnson's emotional distress claim clearly derives from her discrimination allegations: It incorporates the

same facts as those underlying Ms. Johnson's Title VII claim. Compl. ¶ 33. And, without alleging additional facts, it argues that because "[t]he Library acted intentionally in conspiring to discriminate against its male employees and retaliate against [Ms.] Johnson," Ms. Johnson "has suffered and continues to suffer severe emotional distress." *Id.* ¶¶ 34–36. In her opposition brief, Ms. Johnson does not change the position taken in her complaint: it repeats two sentences of the complaint, Compl. ¶¶ 34–35, before concluding that Ms. Johnson's "emotional suffering is the direct result of Defendant's [discriminatory and retaliatory] conduct." Pl.'s Mem. 9. In sum, Ms. Johnson has not, anywhere in her filings, alleged an assault or other facts "actionable apart from Title VII because [they are] beyond the meaning of discrimination." *Boyd*, 273 F. Supp. 2d at 96. Her emotional distress claim derives completely from the Library's alleged Title VII violations, and thus "[a]ny emotional injuries" arising from those violations "are subsumed within Title VII." *Id.* Because Title VII provides a remedy for Ms. Johnson's emotional injuries, it preempts her common law emotional distress claim. *See generally* 42 U.S.C. § 2000e-5(g)(1) (allowing the Court to award "equitable relief as the court deems appropriate" to redress "an unlawful employment practice" under Title VII); *id.* § 2000e-16(a), (d) (making § 2000e-5 applicable to civil actions against the Library of Congress). The Court will therefore grant the Library's motion to dismiss that common law tort claim.

## C.  Injunctive Relief

Ms. Johnson styles the last count of her complaint as a claim for "Injunctive Relief." *See* Compl. ¶¶ 37–39. Without citing to documents beyond the complaint, the Library urges dismissal of this last count because injunctive relief is "not usually available in employment cases," "is an extraordinary remedy," and "must be sparingly granted." Def.'s Mem. 18 (quoting *Robinson–Reeder v. Am. Council on Educ.*, 626 F. Supp. 2d 11, 14 (D.D.C. 2009)). Because the

Library's argument does not reference "matters outside the pleadings," *see* Fed. R. Civ. P. 12(d), and does not argue that the Court lacks subject-matter jurisdiction, *see* Fed. R. Civ. P. 12(b)(1), the Court analyzes this argument under the legal standard for motions to dismiss for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6); *supra* Part III.B.1 (articulating the Rule 12(b)(6) standard of review).

Although the Library contends that Ms. Johnson "shows no basis for this extraordinary relief she requests" in her third claim, Def.'s Mem. 18, the Court chooses to dismiss the claim for a more basic reason: "Injunctive relief . . . is not a freestanding cause of action, but rather . . . a form of relief to redress the other claims asserted by [Ms. Johnson]." *Base One Techs., Inc. v. Ali*, 78 F. Supp. 3d 186, 199 (D.D.C. 2015); *accord Lewis v. Gov't of D.C.*, No. 15-0521, 2015 WL 8082293, at *3 (D.D.C. Dec. 7, 2015). Of course, as this Court has repeatedly held in similar circumstances, "this dismissal does not preclude the court from ultimately issuing an injunction if a future determination on the merits warrants such equitable relief." *Kemp v. Eiland*, No. 14-1572, 2015 WL 5826873, at *10 n.13 (D.D.C. Sept. 30, 2015); *accord Lewis*, 2015 WL 8082293, at *3; *Ali*, 78 F. Supp. 3d at 199. Thus, if Ms. Johnson were to prevail on her Title VII claim, she might merit an injunction at that time. *See generally* 42 U.S.C. § 2000e-5(g) (authorizing injunctive relief "[i]f the court finds that the [Library] has intentionally engaged in . . . an unlawful employment practice charged in the complaint"). For now, however, Ms. Johnson's claim for injunctive relief must be dismissed because it is "a type of remedy, not a freestanding cause of action." *Equitas Disability Advocates, LLC v. Bryant*, No. 14-1644, 2015 WL 5728365, at *10 (D.D.C. Sept. 29, 2015). And any requests for injunctive relief will be addressed, if necessary, as a remedy at the conclusion of the case.

## IV.  CONCLUSION

Because, based on the skeletal record currently before it, the Court concludes that a reasonable jury could return a verdict in Ms. Johnson's favor on her Title VII claim based on sex discrimination or retaliation with respect to the removal of certain supervisory duties, the Court denies the Library summary judgment on Ms. Johnson's first claim for relief, asserted in Count I of her complaint. *See* Compl. ¶¶ 26–32. But because Ms. Johnson's other claims are not claims upon which relief may be granted, the Court dismisses Ms. Johnson's claims for relief concerning her performance appraisal, asserted in Count I of her complaint, as well as her second and third claims for relief, asserted in Counts II and III of her complaint. *See* Compl. ¶¶ 33–39.

For the foregoing reasons, the Library's motion to dismiss, or, in the alternative, for summary judgment (ECF No. 8) is **GRANTED IN PART** and **DENIED IN PART**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 31, 2016                                        RUDOLPH CONTRERAS
                                                                            United States District Judge